**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TARA LYNN BEHNER, | ) | CASE NO. 1:25-CV-2231 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Tara Lynn Behner's application for a period of disability and Disability Insurance Benefits (DIB). Ms. Behner seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consents and Order, ECF No. 4.)

For the reasons set forth below, the Court REVERSES the Commissioner's decision denying Ms. Behner's application for benefits and REMANDS this matter to the Social Security Administration for further consideration consistent with this opinion.

## II. PROCEDURAL HISTORY

In August 2023, Ms. Behner applied to the Social Security Administration (SSA) seeking a period of disability and DIB benefits, claiming that she became disabled on June 1, 2023. (Tr. 196.)[1] She identified ten allegedly disabling conditions: (1) low blood pressure;

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 37"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 1837").

(2) fibromyalgia; (3) bipolar disorder; (4) anxiety; (5) depression; (6) "dege[ner]ative spine"; (7) osteopenia; (8) "bu[lg]ing disc in lower spine; (9) arthritis in the hips and lower back; and (10) asthma. (Tr. 226.)

The SSA denied Ms. Behner's application initially and upon reconsideration. (Tr. 75, 85, 87, 97.) Ms. Behner requested a hearing before an administrative law judge (ALJ). (Tr. 113.) Ms. Behner's counsel submitted a brief in advance of the hearing. (Tr. 299–302.) The ALJ held a hearing on August 22, 2024, at which Ms. Behner was represented by counsel. (Tr. 43–74.) Ms. Behner testified, as did an independent vocational expert (VE). (*Id.*)

On October 11, 2024, the ALJ issued a written decision finding that Ms. Behner was not disabled. (Tr. 23–37.) Ms. Behner requested review of the ALJ's decision. (Tr. 305–08.)

On July 18, 2025, the Appeals Council denied review. (Tr. 13.)

After receiving an extension of her time to file a civil action (Tr. 1), Ms. Behner filed her Complaint on October 17, 2025, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Behner asserts the following assignment of error for review:

> Substantial evidence does not support the ALJ's RFC determination because the ALJ did not properly evaluate Plaintiff's subjective complaints or the medical opinions and/or prior administrative medical findings.

(Pl.'s Merit Br. at 7, ECF No. 8, PageID# 1873.)

## III. BACKGROUND

### A. <u>Personal, Educational, and Vocational Experience</u>

Ms. Behner was born in January 1978 and was 45 years old on the date of her application. (*E.g.*, Tr. 48, 196.) She graduated from high school. (Tr. 50, 227.) She lives with her partner and teenage son. (Tr. 48.) She testified that she has a driver's license and is able to drive. (Tr. 49–50.) She previously did janitorial work part-time for a local community club–restaurant, most recently

in 2023. (Tr. 50, 227.) She has not worked since 2023. (Tr. 50–51, 227.) She had previously applied for disability benefits, but those applications were denied before the hearing level. (Tr. 240–41.)

**B. Function Reports**

Ms. Behner completed a function report on September 20, 2023. (Tr. 243–50.) She wrote that she was unable to work due to her fibromyalgia and pain in her back and hips. (Tr. 243.) She said that she was unable to "get around good" or bend and lift, and she gets exhausted. (*Id.*) She does not like to be away from home, and her ADHD makes it hard for her to stay on task. (*Id.*)

On an average day, she wakes up and takes her child to school and her partner to work. (Tr. 244.) When she gets home, she does a few chores, like dishes and dusting. (*Id.*) She tends to clean one room a day. (*Id.*) Usually, she will then take a nap before picking up her child and partner. (*Id.*) Ms. Behner and her partner will then make dinner together, "then [she is] usually done for the day." (*Id.*)

Ms. Behner wrote that she feeds and gives water to their pets, but she does not clean their cages because she cannot bend. (*Id.*) She used to run and play sports, but now her joints hurt to the point that she has trouble sleeping. (*Id.*) She must sit when she dresses herself, and she struggles to put on her socks. (*Id.*) She does not shower as much as she wants because doing so takes a lot of energy. (*Id.*) Her partner helps encourage her to shower and take her medicine. (Tr. 245.) She is able to cook, including preparing complete meals with her partner, and she also irons, dusts, and folds laundry. (*Id.*)

Ms. Behner gets outside frequently, and she enjoys sitting on the patio. (Tr. 246.) She is able to drive, but her partner almost always goes with her to provide assistance and to help with her anxiety. (*Id.*) They go grocery shopping once every two weeks, but sometimes Ms. Behner needs to use a cane, and it takes them longer than normal. (*Id.*) She socializes with others over the

phone every day, and they have occasional visitors. (Tr. 247.) But most days she "just sit[s] at home" because getting around is difficult for her. (*Id.*)

Ms. Behner wrote that she has difficulty lifting, squatting, bending, reaching, and kneeling, and she said she frequently walks with a cane. (Tr. 248.) She would have to take a couple breaks if she needed to walk a city block. (*Id.*) She can pay attention pretty well, unless there are distractions. (*Id.*) She follows spoken instructions better than written ones. (*Id.*) She gets along with authority figures well. (*Id.*) She does not handle stress or changes in routine well because this causes anxiety. (Tr. 249.)

Ms. Behner stated that her physical therapist recommended that she use a cane. (*Id.*) She uses the cane when she is going to be walking for a while or when her hips and back bother her. (*Id.*)

In January 2024, Ms. Behner told the Agency that she no longer runs errands except for monthly grocery shopping. (Tr. 260.) She naps a few times a day. (*Id.*) Days when she has the energy to vacuum are few and far between. (*Id.*) She walks with a cane. (*Id.*) She will go days without showering, and some days she spends all day in her room. (*Id.*) Her legs give out on her, and she has fallen due to pain. (*Id.*)

### C. Relevant Hearing Testimony

#### 1. *Ms. Behner's Testimony*

Ms. Behner testified that on a typical day, she wakes up at 9:00 or 10:00 in the morning and cares for her pet guinea pigs. (Tr. 51.) She usually takes a nap in the early afternoon before making dinner. (*Id.*) When she is able, she cleans up from cooking and then "just sit[s] for the evening." (*Id.*) She usually goes to bed around 10:00 or 11:00 at night. (*Id.*) There are times that she does not want to leave the house, but when she needs something from the store and feels up to it, she will go grocery shopping. (*Id.*) But doing so is a "chore," especially getting up and down

the more than 20 stairs leading to their home. (Tr. 51–52.) She often uses a cane in the store, and navigating the store is difficult. (Tr. 52.) She estimated that she shops for groceries once a month. (*Id.*)

Ms. Behner does not do laundry; her partner or son take their laundry to a laundromat. (Tr. 52.) Her partner cleans the pets' cages. (Tr. 53.)

Ms. Behner used to enjoy running and playing sports, but she cannot physically do those things anymore and she "miss[es] it every day." (Tr. 52–53; *see also* Tr. 55.) She does not volunteer, attend social groups, or socialize with anyone except her immediate family and, occasionally, her sisters. (Tr. 53.)

Ms. Behner described that she began suffering with pain in around 2015, and she struggled to be diagnosed with fibromyalgia until 2018 as the pain continued getting worse. (*See* Tr. 53–54.) Now, her "life is not what it used to be" or what she wants it to be. (*Id.*) She is in constant pain in her lower back, she is depressed, and she does not stand or walk much. (*Id.*) She has tried to work, but she feels she cannot work anymore. (*Id.*) She gets exhausted easily. (*Id.*) Mentally, she gets frustrated and down." (*Id.*) She in general does not feel that she is "the same person [she] used to be" and is not "capable of doing the things that [she] used to be able to do, whether it be play sports, whether it be working, whether it be out socializing." (*Id.*) She has trouble with her memory has anxiety. (Tr. 55.)

Ms. Behner's fibromyalgia causes pain "all over" her body. (Tr. 56.) It hurts her shoulders, down her back, and down her legs "something terrible," making her legs weak. (*Id.*) She gets "brain fog" or "fibro fog." (Tr. 57.) Her pain is a seven out of ten on most days, even on medication, and it increases to a ten when it's very bad, and those days are becoming worse than they used to

be. (*Id.*) She experiences ten out of ten pain around two or three days a week. (Tr. 58.) She has never sought emergency room treatment, but she has considered it. (Tr. 59.)

Ms. Behner described that she uses a cane to walk around her house because her legs feel weak and "heavy, [l]ike a cinder block is pressing on [her] feet." (Tr. 60.) She has fallen because she has lost her balance and walking is painful, although some days are better than others. (*Id.*)

Ms. Behner testified that she is going to physical therapy. (Tr. 61.) When she navigates the grocery store, she needs to frequently stop to lean on something. (*See* Tr. 62.) She can walk maybe 50 or 60 feet before needing to rest for a minute or two. (*Id.*) After standing for 30 seconds, she finds that she needs to lean in different positions because of pain in her hips, feet, and lower back. (Tr. 62–63.) When sitting, she needs to change positioning about every 20 minutes. (Tr. 63–64.) She could lift 25 pounds, at most five times a day, during the relevant time period. (Tr. 64–65.) She experienced fatigue and urinary incontinence during the relevant period. (Tr. 64–67.)

Ms. Behner said it was hard for her to go places due to her anxiety. (Tr. 68.)

**2. *Vocational Expert's Testimony***

Jacqueline Kennedy-Merritt testified as a vocational expert ("VE") at the hearing. (Tr. 70.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Behner's age and education is capable of work at the light exertional level, with additional limitations. (*Id.*) Specifically, the person can occasionally climb ramps, stairs, ladders, ropes, and scaffolds. (Tr. 71.) They can occasionally balance, stoop, and crawl. (*Id.*) They can frequently kneel and crouch. (*Id.*) They can occasionally work at unprotected heights and tolerate occasional exposure to dangerous moving machinery. (*Id.*) They can tolerate no more than frequent exposure to humidity, wetness, dust, odors, fumes, extreme cold, and pulmonary irritants. (*Id.*) They can tolerate no more than occasional exposure to vibrations and to open bodies of water. (*Id.*) They can understand,

remember, carry out, and complete instructions with no strict production rate requirements (like assembly line work). (*Id.*)

The VE testified that such a person could perform the work of a router (DOT 222.587-038), marker (DOT 209.587-034), or sorter (DOT 569.687-022). (*Id.*)

The VE testified that employers' tolerance for time off task is "[n]o greater than 10 percent" and, for absences, no more than once per month. (Tr. 72.)

### D. State Agency Consultants

A disability examiner (Megan Higley), a physician (King Leong, M.D.), and a psychologist (Kari Kennedy, Psy.D.) reviewed Ms. Behner's claim at the initial review level in November 2023. (Tr. 75–86.)

Dr. Kennedy opined that Ms. Behner had mild limitations in her ability to interact with others and to adapt and manage herself. (Tr. 79.) She had a moderate limitation in her ability to concentrate, persist, and maintain pace. (*Id.*) Specifically, she was moderately limited in her ability to maintain attention and concentration for extended periods. (Tr. 83.) But Dr. Kennedy opined that, despite Ms. Behner's history of ADHD, the "[r]ecords note that her attention and concentration were intact." (*Id.*) Dr. Kennedy assessed no significant social interaction or adaptation limitations. (Tr. 83–84.)

Dr. Leong opined that Ms. Behner's statements about her symptoms were partially consistent with the record. (Tr. 80.) Dr. Leon explained that the records show that Ms. Behner "does have some tenderness in her hips and lumbar spine" but her MRI was negative for avascular necrosis, and while she does have a bulging disc at L4/5, she has no stenosis or nerve root compression. (*Id.*) The doctor pointed out that, on examination, Ms. Behner had good range of motion, full strength, and she could walk on her heels and toes with "no mention of a cane." (*Id.*)

Based in part on these opinions, the consultants determined that Ms. Behner retained the ability to perform the work of a bakery worker, handkerchief folder, or table worker and was not disabled. (Tr. 85.)

In a letter explaining the decision to Ms. Behner, the agency wrote that it found that she may feel some discomfort in her hips and back, but the medical evidence shows that she was able to do some light lifting, and her ability to stand and walk was not significantly limited. (Tr. 107.)

In March 2024, at the reconsideration level, a different disability examiner (Kristin Knicely), physician (Leon Hughes, M.D.), and psychologist (Valerie Budervic, Psy.D.) reviewed Ms. Behner's claim. (Tr. 87–97.)

Drs. Hughes and Budervic found that the initial-level conclusions were supported by and consistent with the evidence of record and affirmed that Ms. Behner is not disabled. (Tr. 97.)

In a letter to Ms. Behner, the agency wrote that the medical evidence shows that she is capable of lifting and carrying some items, as well as standing and walking with regular breaks. (Tr. 112.)

**E. <u>Relevant Medical Evidence</u>**

In September 2018, prior to the relevant alleged disability period, Judith Manzon, M.D., a rheumatologist, evaluated Ms. Behner for fatigue, memory loss, and diffuse musculoskeletal pain. (Tr. 1018.) Dr. Manzon noted that Ms. Behner had 12 out of 18 tender points on examination and concluded that her clinical picture was most consistent with fibromyalgia. (*Id.*) It seems that Ms. Behner was treated with pregabalin (Lyrica) starting shortly thereafter. (*See* Tr. 324.)

Ms. Behner consulted with Matthew Rish, M.D., on July 5, 2022. (Tr. 343.) She complained of right hip pain and pain in the bilateral hands, and she described "all over" body aches and joint pain. (Tr. 345.) On examination, there was no joint swelling appreciated, and she had normal movements in all extremities and normal range of motion. (Tr. 348.) There was some

tenderness noted over the bilateral upper buttocks and anterior hip sockets. (*Id.*) She was continued on a nonsteroidal anti-inflammatory drug, to be taken as needed. (Tr. 344.) She was encouraged to engage in regular exercise and recommended to stop using medical marijuana. (Tr. 345.) Ms. Behner declined to stop using marijuana, explaining that "she feels like it really helps her." (*Id.*)

MRI imaging in November 2022 found degenerative changes in the lower lumbar spine with at least moderate facet degenerative changes noted. (Tr. 315; *see also* Tr. 327.) There were mild degenerative changes in the hips. (*Id.*) Ms. Behner reported continued low back and bilateral leg pain at an appointment in December 2022. (Tr. 322.) She described back pain radiating into the hips and down the right leg, to the shin. (*Id.*) On examination, her gait was normal, and she was able to walk on her heel and toes. (Tr. 325.) There was decreased range of motion of the lumbar spine and tenderness in the lumbar paraspinal muscles, but she had full strength in the spine and upper and lower extremities. (*Id.*) X-ray imaging revealed some degenerative disk disease at the L5–S1 levels, with very mild dextroscoliosis noted. (Tr. 326.)

Ms. Behner sought treatment in March and May 2023 for a chronic cough and rib pain. (Tr. 386, 388, 430, 1565.) X-ray imaging of the ribs did not reveal abnormalities. (Tr. 1545.) She sought treatment in March 2023 for management of her mental-health conditions. (Tr. 481.)

MRI imaging of the spine in March 2023 revealed a bulging disc at the L4–L5 level without measurable canal stenosis or nerve root compression. (Tr. 1547.)

Ms. Behner reported in May 2023 that she had recently traveled to Virginia and back. (Tr. 1567.) During that appointment, Ms. Behner was diagnosed with a right seventh rib fracture, and the provider recommended bone-density scanning. (Tr. 1568.) The provider gave her a form excusing her from work and physical activity for around two days. (Tr. 1570.)

Ms. Behner consulted with Dr. Rish on June 2, 2023, reporting that she had been involved in a car accident after she "[p]assed out due to coughing." (Tr. 367.) She later told her mental-health professionals that she had been tired from "working a lot" and "went off the road[] and hit [a] tree." (Tr. 465.) She had been seen in the emergency room, with some bruising but no severe injuries or new fractures found. (Tr. 367; *see also* Tr. 834–36, 1572.) She told Dr. Rish that she had stopped smoking marijuana and was cutting back on tobacco use. (Tr. 367.) She further described that her chronic fibromyalgia pain was getting worse. (*Id.*) Gabapentin was helping a little, and Ms. Behner planned to follow up with a rheumatologist. (*Id.*)

When Ms. Behner saw Dr. Rish on June 13, 2023, she said that her cough was "gradually improving." (Tr. 587.) But she continued to report worsening fibromyalgia pain. (*Id.*) Bone-density testing in June 2023 showed osteopenia in the hip and femur. (Tr. 586, 1548.) She was recommended to start taking vitamin D and calcium supplements. (*Id.*)

Ms. Behner followed with her mental-health treatment providers in June 2023 (Tr. 461), July 2023 (Tr. 457), and September 2023 (Tr. 453).

Ms. Behner was still having trouble with her cough in October 2023. (Tr. 569.) A pulmonologist had found no pulmonary reason for the cough and recommended a cardiac evaluation. (*Id.*; *see also* Tr. 572.) Ms. Behner told Dr. Rish on October 4, 2023, that she had "passed out" from coughing three times in the last two weeks. (*Id.*) She was referred to a cardiologist. (Tr. 571.)

Ms. Behner followed up with Dr. Manzon on October 10, 2023. (Tr. 1018.) She complained of diffuse musculoskeletal pain. (*Id.*) She described that she felt her symptoms were "rapidly progressing" such that she "hurts all over" and the pain was "consuming [her] life." (Tr. 1019.) She said her pain was a level six out of time, most severe in her hips and low back. (*Id.*) She

endorsed sensitivity to light and loud noises, occasional lightheadedness, fatigue, concentration problems, forgetfulness, and sensitivity to touch. (*Id.*) After examination, Dr. Manzon concluded that there were no compelling findings for a systemic rheumatological disease and wrote that "[h]er present musculoskeletal symptoms can be explained by fibromyalgia." (Tr. 1022.) Dr. Manzon had found 18 out of 18 fibromyalgia tender points, although Ms. Behner retained full strength in her extremities and had full range of motion in all joints. (Tr. 1020–21.) She was referred to a chronic pain rehabilitation program, and certain medication changes were made. (Tr. 1022.)

Ms. Behner consulted with Benjamin Abraham, M.D., a pain medicine doctor, on January 11, 2024. (Tr. 1011.) She complained of "pain . . . everywhere," noting that her low back and buttock were the most severe. (*Id.*) She described the pain as an eight or nine of ten in severity. (*Id.*) On examination, Ms. Behner displayed normal extremity strength and full, pain-free range of motion over the peripheral joints. (Tr. 1014.) But there was pain on palpation of the lumbar paraspinal muscles and positive facet loading bilaterally. (*Id.*) There was also pain on palpation of the posterior superior iliac spine. (*Id.*) She was noted to be walking with a cane. (*Id.*) Dr. Abraham agreed that the fibromyalgia criteria are "certainly met," although he did not have an explanation for why Ms. Behner did not experience much benefit from medication management with Cymbalta or gabapentin. (*Id.*) She was recommended to start "Fibro SMA participation."[2] (Tr. 1015.)

Treatment notes from later in 2024 reflect that Ms. Behner participated in physical therapy but continued to seek treatment for back pain. (*See, e.g.*, Tr. 1236; 1237 (examination finding tenderness in the lumbar spine and sacroiliac joints, but with normal gait); 1446.)

## IV. THE ALJ'S DECISION

The ALJ found that Ms. Behner last met the insured status requirements of the Social

[2] This may refer to a shared medical appointment treatment format.

Security Act on September 30, 2023. (Tr. 28.) The ALJ further found that Ms. Behner had not engaged in substantial gainful activity from the alleged onset date (June 1, 2023) to the date last insured. (*Id.*)

The ALJ next determined that Ms. Behner had the following severe impairments through the date last insured: (1) osteoarthritis and allied disorders; (2) spine disorders; (3) fibromyalgia; (4) depressive disorders; (5) anxiety disorders; (6) attention-deficit/hyperactivity disorder; and (7) posttraumatic stress disorder. (*Id.*)

The ALJ also found that Ms. Behner had a non-severe impairment of mild persistent asthma. (Tr. 28–29.) The ALJ stated that he considered all of Ms. Behner's impairments, even those deemed non-severe, when assessing her residual functional capacity. (Tr. 29.)

The ALJ concluded that none of Ms. Behner's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Ms. Behner had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 31.) Specifically, she can occasionally climb ladders, ropes, scaffolds, ramps, and stairs. (*Id.*) She can frequently balance, kneel, and crouch. (*Id.*) She can occasionally stoop and crawl. (*Id.*) She can occasionally work at unprotected heights, and she can have occasional exposure to dangerous moving machinery. (*Id.*) She can frequently be in humidity, wetness, dust, odors, fumes, pulmonary irritants, and extreme cold. (*Id.*) She can be in vibration occasionally. (*Id.*) She can have no more than occasional exposure to open bodies of water. (*Id.*) She can understand, remember, carry out, and complete instructions with no strict production rate pace (like on an assembly line). (*Id.*)

The ALJ found that Ms. Behner had no past relevant work. (Tr. 36.)

The ALJ then determined that—considering Ms. Behner's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as an "router" (DOT 222.587-038), "marker" (DOT 209.587-034), and "sorter" (DOT 569.687-022). (Tr. 37.) The ALJ therefore found that Ms. Behner was not disabled. (*Id.*)

## V. LAW & ANALYSIS

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by

substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.”).

Finally, a district court cannot uphold an ALJ’s decision, even if there “is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.” *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. Standard for Disability**

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage “in substantial gainful activity by reason of any medically determinable physical or mental impairment,” or combination of impairments, that can be expected to “result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.” 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims for both DIB and SSI follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently engaged in “substantial gainful activity” at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a “severe impairment” in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A “severe impairment” is one that “significantly limits . . . physical or mental ability to do basic work activities.” *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P,

Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent him

from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

**C. <u>Analysis</u>**

Ms. Behner's sole assignment of error presents two discrete arguments. The Court deals with each in turn.

**1. Ms. Behner's Subjective Fibromyalgia Complaints**

Ms. Behner first contends that the ALJ failed to adequately evaluate her subjective descriptions of her symptoms and limitations stemming from her fibromyalgia. She acknowledges that the ALJ "attempted to correctly analyze" her subjective complaints, but she argues that the ALJ ultimately relied only on "boilerplate language" and a "brief" summary of her testimony and treatment records in finding her subjective statements only partially consistent with the record. To the extent that the ALJ went further, Ms. Behner insists that his reasoning placed undue emphasis on a lack of objective evidence and normal examination findings.

SSR 12-2p sets out a roadmap for the ALJ in evaluating a claimant's fibromyalgia. 2012 WL 3104869, at *6 (July 25, 2012). Among other things, the ALJ must evaluate the claimant's subjective complaints pursuant to the two-step process set forth in SSR 96-7p. First, the ALJ must determine whether the claimant has a medically determinable impairment that can reasonably be expected to produce the claimant's alleged symptoms. *Id.* Second, the ALJ must evaluate the intensity and persistence of the claimant's pain and other symptoms to determine the extent to which they limit the claimant's ability to work. *Id.*

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* at *6. SSR 16-3p identifies seven factors that the SSA will

consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at *7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

SSR 12-2p provides that, given the distinct characteristics of fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" 2012 WL 3104869, at *6. And because fibromyalgia presents without objectively alarming signs, cases involving fibromyalgia "place[] a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis." *Jones v. Comm'r of Soc. Sec.*, No. 1:21-CV-01309-SO, 2022 WL 3567412, at *10 (N.D. Ohio July 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio Aug. 18, 2022). As the Sixth Circuit has held, "where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).

Here, as Ms. Behner acknowledges, the ALJ found fibromyalgia to be a severe medically determinable impairment and specifically found that "[t]he evidence shows [that] the claimant's symptoms and presentation are consistent with fibromyalgia" and that she "also has degenerative changes in the hips and lumbar spine." (Tr. 28, 34.) Moving to the second step, though, the ALJ found that the medical evidence only "partially supports" Ms. Behner's allegations about the intensity, persistence and limiting effects of her fibromyalgia and other conditions. (Tr. 32.) The ALJ summarized the medical evidence relevant to Ms. Behner's fibromyalgia, back, and hip pain over the course of three pages (Tr. 32–34.) Ms. Behner does not allege that the ALJ's summary is in any way incomplete or inaccurate.

The ALJ then specifically reasoned as follows:

> [S]he has generally had normal strength and gait, and intact sensation. I have limited the claimant to light work with postural and environmental limitations. For example, she reported aggravation of her symptoms due to weather changes, and I accordingly limited exposure to humidity, wetness,

> and extreme cold. . . . I limited exposure to dusts, odors, fumes, and pulmonary irritants even though I found her asthma to be non-severe. Moreover, the added complications of pain, fatigue and medication side effects have been considered in accordance with SSR 16-3p and SSR 96-8p in assessing the residual functional capacity.

(Tr. 34.)

Later in the opinion, after discussing Ms. Behner's mental-health symptoms and limitations, the ALJ stated as follows:

> Overall, the evidence demonstrates that from a physical and mental standpoint, the claimant does have severe impairments that limit her. They are accommodated by the restrictive residual functional capacity assessed above. The facts in the record do not dispute that the claimant has conditions, which singly or in combination, may cause pain or other difficulty. What these pieces of evidence suggest is that the claimant's symptoms may not be accurately reported, may not exist at the level of severity alleged, and/or may have other mitigating factors against their negative impact on the claimant's ability to engage in work activity. I carefully considered the claimant's testimony along with the medical, objective, and subjective evidence discussed above. To the extent that her testimony is consistent with that evidence, it is reflected in the residual functional capacity.

(Tr. 35.)

The ALJ found the opinions of the state agency medical consultants to be persuasive, reasoning in part that " the evidence shows [that] the claimant's symptoms and presentation are consistent with fibromyalgia . . . [and with] degenerative changes in the hips and lumbar spine" but that "[o]verall, despite these findings, she has generally had normal strength and gait, and intact sensation." (*Id.*)

The Commissioner defends the ALJ's decision, pointing out that even SSR 12-2p states that there must be "sufficient *objective evidence*" to support a claimant's allegation that their fibromyalgia is disabling. *See* 2012 WL 3104869, at *2 (emphasis added). The Commissioner argues that here the ALJ considered Ms. Behner's testimony and statements to providers about her

pain and limitations, the treatment record and examination findings, and her treatment regimen and its effectiveness. The Commissioner further points out that the RFC is consistent with the opinions of the state agency medical consultants, which courts have held can constitute substantial evidence supporting an ALJ's decision. *See Maldonado o/b/o/ A.C. v. Comm'r of Soc. Sec.*, No. 4:20-cv-1878, 2022 WL 361038, at *6 (N.D. Ohio Jan. 14, 2022) (collecting cases), *report and recommendation adopted*, 2022 WL 356557 (Feb. 7, 2022). The Commissioner insists that an ALJ's findings under these circumstances are "'virtually unchallengeable.'" *See Phillips v. Comm'r of Soc. Sec.*, No. 5:20-CV-126, 2021 WL 252542, at *9 (N.D. Ohio Jan. 26, 2021) (quoting *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x. 508, 511 (6th Cir. 2013)). Moreover, the Commissioner points out that Ms. Behner points to no specific additional functional limitation that she would have had included in the RFC.

In reply, Ms. Behner largely reasserts her arguments from her opening brief. She reiterates that the ALJ's "main reasoning for discounting her subjective complaints" relied on "some normal objective findings," which she says requires remand.

After careful consideration, the Court agrees with Ms. Behner that the ALJ failed to adequately articulate how the ALJ specifically considered what weight to give to Ms. Behner's statements and the reason for that weight.

It is incumbent upon the ALJ to "explain [her] credibility determinations in [her] decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 643 (6th Cir. 2013) (alterations in original) (internal quotation marks and citation omitted).

Here, the best that the Court can say about the ALJ's analysis is that he identified that he considered certain of the SSR 16-3p factors without specifying *how* he considered them. For example, the ALJ wrote that he considered "the added complications of pain, fatigue and medication side effects" and he suggested that this consideration led him to believe that Ms. Behner may not have accurately reported her symptoms or that her symptoms "may have other mitigating factors against their negative impact on the claimant's ability to engage in work activity." (Tr. 34–35.) But the ALJ does not explain how he reached that conclusion, what "mitigating factors" he found may exist, or what pieces of medical evidence outweighed Ms. Behner's subjective statements about her pain. The ALJ said that he considered the "medical, objective, and subjective evidence discussed above," without saying *how* he considered them.

Notably, this is not a case where, reading the opinion as a whole, it is sufficiently clear how the ALJ arrived at his conclusions, notwithstanding his vague statements when discussing the RFC. *Compare Treadway v. Comm'r of Soc. Sec.*, No. 1:25-cv-1744, 2026 WL 1674852, at *17–20 (N.D. Ohio June 10, 2026), *report and recommendation adopted*, 2026 WL 1897036 (N.D. Ohio July 1, 2026) (ALJ noted, among other things, that pain and fatigue complaints were not repeated frequently throughout the record, that the claimant frequently declined physical and occupational therapy and other recommended treatment, told her providers inconsistent things about the medication she was taking, and engaged in substantial activities of daily living inconsistent with disabling fibromyalgia pain).

To the contrary, the ALJ in summarizing the medical evidence accurately noted that Ms. Behner was found to have significant findings with respect to fibromyalgia tender points, responded to Lyrica better than gabapentin, and had no other compelling systemic rheumatic disease. (Tr. 32–33.) The ALJ noted that it was unclear to the pain management doctor why Ms.

Behner was discontinued from Lyrica, and the ALJ noted the records relevant to the degenerative changes in her back and hips. (Tr. 32–34.) It is not at all clear how the ALJ drew a line, so to speak, from these records to his conclusion that Ms. Behner's subjective statements were not accurately reported or were somehow mitigated. (*See* Tr. 35.)

Moreover, to the extent that the ALJ did point to specific portions of the record in his analysis, he only pointed to examination findings that Ms. Behner tended to have normal strength and gait, and intact sensation. (Tr. 34–35.) But "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Id.* (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)).

Here, it is clear that Ms. Behner's subjective pain complaints "play[ed] an important role in the diagnosis and treatment" of her conditions. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007). Among other things, a rheumatologist and pain management doctor both agreed that Ms. Behner met the diagnostic criteria for fibromyalgia, the rheumatologist ruled out other possible rheumatological causes for her alleged pain, and all her doctors worked to get her pain under control, with the pain management doctor lamenting the lack of success and an unclear etiology shortly after the date last insured.

That being the case, it was "particularly important" for the ALJ to have provided an adequate justification for discounting Ms. Behner's statements. *Rogers*, 486 F.3d at 248. The only specific explanation the ALJ provided was based on a lack of corroborative examination findings, which is "'basically irrelevant' in the context of analyzing fibromyalgia symptoms." *Fyffe v.*

*Comm'r of Soc. Sec.*, No. 1:21-cv-332, 2022 WL 2176538, at *10 (N.D. Ohio June 16, 2022) (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011)).

An ALJ's reliance on a lack of objective findings may not require remand where the ALJ also relies on other considerations such as a claimant's activities of daily living or improvement with treatment. *See, e.g.*, *Hardman v. Berryhill*, No. 5:16CV2795, 2018 WL 1545707, at *17–18 (N.D. Ohio Mar. 5, 2018) (holding that ALJ's reliance on relatively benign clinical findings did not constitute reversible error where ALJ also relied on improvement on claimant's condition and claimant's testimony regarding activities of daily living). Here, though, despite referencing some other SSR 16-3p factors, the ALJ did not explain how he considered those factors, and it is not clear from the rest of the decision how he did so either. Remand is therefore necessary.

Before concluding, the Court notes that it is not convinced by the Commissioner's argument that any error in the ALJ's analysis is harmless because the RFC was nevertheless consistent with the findings of the state agency medical consultants on this issue.

"It is well established that it is the responsibility of the ALJ . . . to evaluate all relevant medical evidence of record and determine a claimant's RFC." *Chilgren v. Saul*, No. 5:19cv26, 2020 WL 994656, at *5 (N.D. Ohio Mar. 2, 2020). The fact that the state agency medical experts may have considered Ms. Behner's records "does not absolve the ALJ of his independent responsibility to evaluate this evidence and adequately consider it in assessing [a claimant's] RFC." *Id.*

None of this is to say that Ms. Behner was necessarily disabled during the relevant period. To the contrary, the Sixth Circuit has held that a diagnosis of fibromyalgia "does not automatically entitle [the claimant] to disability benefits. . . . " *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008). "Some people may have such a severe case of fibromyalgia as to be totally

disabled from working . . . but most do not and the question is whether [the claimant] is one of the minority." *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996). But governing law required the ALJ to evaluate Ms. Behner's subjective statements about her fibromyalgia pain without placing undue weight on the lack of objective evidence during physical examinations. Because the ALJ failed to do that, and his other vague statements do not allow one to trace any other reasoning in support of his conclusions about the weight assigned to Ms. Behner's subjective statements, remand is required.

The first assignment of error is sustained.

**2. The State Agency Medical Consultants' Opinions**

Ms. Behner next contends that the ALJ erred when he found the state agency medical consultants' opinions to be persuasive but nevertheless chose to adopt an RFC with less restrictive environmental restrictions. Specifically, she points out that the consultants opined that she needed to avoid concentrated exposure to extreme cold, humidity, fumes, odors, dusts, gases, and poor ventilation and must avoid even moderate exposure to vibrations and work hazards like unprotected heights, dangerous machinery, or open bodies of water. (*See* Tr. 82.) But, she says, the ALJ concluded that she could frequently work in extreme cold, in humidity, and in dust, odors, fumes, and pulmonary irritants. (*See* Tr. 31.) The ALJ further found, she says, that she could occasionally work at unprotected heights, around dangerous moving machinery, and with exposure to open bodies of water. (*See id.*) She says the ALJ improperly failed to explain how he came to adopt these less restrictive limitations.

In discussing the opinions of the state agency medical consultants, the ALJ wrote the following:

> The State agency medical consultants . . . found the claimant can perform light work except she can occasionally climb ramps and stairs; occasionally

> climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop; frequently kneel and crouch; and occasionally crawl. She should avoid concentrated exposure to extreme cold, humidity, and fumes, odors, dusts, gases, poor ventilation, etc. She should avoid even moderate exposure to vibration and hazards . . . . I find the prior administrative medical findings persuasive. The State agency consultants offered support for their findings, citing objective findings and clinical signs from the record as constituted at the time their findings were made. Although additional evidence has been submitted since that time, that evidence does not support a finding that the claimant's condition is materially different now than it was at the time the findings were made. Thus, the findings remain consistent with the medical and other evidence as a whole. For example, the evidence shows the claimant's symptoms and presentation are consistent with fibromyalgia. She also has degenerative changes in the hips and lumbar spine. Overall, despite these findings, she has generally had normal strength and gait, and intact sensation.

(Tr. 35.)

The Commissioner defends the ALJ's reasoning, first by arguing that the RFC and these opinions may not actually be inconsistent but may rather be merely a "reframing" and "conver[sion]" of those opined limitations. The Commissioner then argues that all three jobs identified by the ALJ at Step Five would not require exposure to the relevant environmental conditions identified, so "the jobs would remain even if the ALJ had used the exact language used in the prior administrative medical findings."

In reply, Ms. Behner argues that the opinions and the RFC do differ, and the ALJ was required to explain the difference where he found the opinions persuasive.

After careful consideration, I again agree with Ms. Behner.

"An ALJ need not incorporate every limitation from a medical source's recommendation, even if it finds that medical source to be persuasive." *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889**,** 2024 WL 2273365, at *3 (6th Cir. May 20, 2024) (citing *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015)). But if the ALJ's "RFC assessment conflicts with an opinion from

a medical source, the [ALJ] must explain why the opinion was not adopted." *Kinney*, 2024 WL 2273365, at *3 (quoting Social Security Ruling 96-8p).

Here, the ALJ found the opinions of the state medical consultants to be fully persuasive, but he nevertheless allowed for work that would have Ms. Behner being occasionally exposed to unprotected heights, dangerous moving machinery, and open water. (*Compare* Tr. 82 (opining that she must avoid even moderate exposure to these hazards)). And the ALJ allowed Ms. Behner to work frequently in extreme cold, in humidity, and in dust, odors, fumes, and pulmonary irritants. (*Compare id.* (opining that she must avoid concentrated exposure to these environmental conditions)).

The Court is not convinced by the Commissioner's explanation—offered without citation to any legal authority—that these were merely translations of the opinions into vocationally relevant terms. Indeed, the Commissioner acknowledges that "occasional" and "frequent" are terms of art that mean that Ms. Behner could be exposed to the environmental condition up to one-third of the time (for "occasional") or up to two-thirds of the time (for "frequent"). (*Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, at Appendix D.) Lacking any explanation at all from the ALJ, and without any developed argument in this appeal, the Court is not convinced that exposure to unprotected heights up to one-third of the time (for example) is consistent with an opinion that one must avoid even moderate exposure to that hazard.

And while it seems true that the jobs identified by the ALJ could likely remain even if the ALJ had adopted the agency consultants' opinions verbatim, the Court notes that the ALJ also omitted these specific limitations from his hypothetical to the VE at the hearing. Where that is the case, the Court is not convinced that any error in adopting different limitations would be harmless.

*See Kinney*, 2024 WL 2273365, at *3–4. "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

Given the ALJ's finding that the consultants' opinions were fully persuasive and supported by the record, and his failure to explain why he chose to change or omit these specific environmental limitations from the RFC, there is no way for the Court to know if the RFC accurately portrayed Ms. Behner's impairments and whether the VE's opinion reflected her true employability.

The Court finds that reversal and remand is appropriate under these circumstances, and the second assignment of error is sustained.

## VI. CONCLUSION

Having sustained Ms. Behner's assignments of error for the reasons set forth above, the Court REVERSES the Commissioner's final decision and REMANDS this matter to the Social Security Administration pursuant to Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g).

On remand, the Administrative Law Judge must further consider Ms. Behner's claim consistent with this opinion, including further consideration of her subjective complaints and the opinions of the state agency medical consultants. The ALJ must take any further action necessary to complete the administrative record, including offering Ms. Behner the opportunity for a hearing, and then issue another decision.

Dated: August 31, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge